# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

## CENTRAL DIVISION



FILED

MAY 2 7 2010

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CR. 10-30021-RAL |
| Plaintiff, | |
| -vs- | MEMORANDUM OPINION AND ORDER |
| THOMAS WILLIAM FREDERICK, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Defendant, Thomas William Frederick ("Frederick"), filed a motion to modify release conditions, Docket No. 24. In his motion, Frederick claims that the statutorily mandated bail conditions, requiring electronic monitoring and a curfew, are facially unconstitutional and as applied to him under the Due Process Clause. He seeks, by way of relief, to have these two conditions, previously imposed on him as part of his pre-trial release, removed. 28 U.S.C. §636(a)(2) provides the Court with original jurisdiction to pass on all pretrial release matters. Because the conditions imposed on Frederick are not facially invalid and/or were not unlawfully applied to him in this case, his motion must be denied to this extent.

I.

Frederick is charged by Indictment with aggravated sexual abuse of a child, abusive sexual contact, sexual abuse of a minor and tampering with a witness in violation of 18 U.S.C. §§1153, 2241(c), 2246(2)(D), 2244(a)(3), 2246(3), 2243(a), 2246(2)(A), and 1512(b)(3). He has pled not guilty to all four charges and is currently awaiting trial.

On March 19, 2010, the Court conducted an evidentiary detention hearing wherein it considered Frederick's request to be released, on a third party custody basis, to three different individuals. The first was his sister, Kathleen Frederick, who was found to be unacceptable because she was a likely witness and had minor children in her home who were also potential witnesses. The second and third were Frederick's son and hired ranch hand, Wayne Frederick and Paul Fast Horse, Jr., respectively, who were likewise rejected as custodians. In doing so, the Court believed that it would be too hard for the two of them to properly supervise and report violations of release conditions given their relationships (father/son and employer/employee) with Frederick. The Court also believed that Frederick should not be released to anyone who resided on, or in close proximity to, the homestead where he and his family lived because of the risks of danger to the community and because some of the residents, including children, may have knowledge of facts relevant to the case and could therefore be called upon to testify as witnesses at trial.

Four days later, on March 23, 2010, the Court held a bail review hearing at which two witnesses testified. After due consideration of the evidence presented and the release plan proposed, the Court agreed to allow Frederick to live in Lake Andes, South Dakota, and be released, on a third party custody basis, to Faith Spotted Eagle and her son, Kip Collins, subject to conditions. These conditions included GPS electronic monitoring and an 8 p.m. to 7 a.m. curfew.

Frederick subsequently moved to modify his release conditions. He alleged that certain conditions in his prior release order were facially unconstitutional and as applied to

2

him. Specifically, he claimed that the electronic monitoring and curfew provisions mandated in 18 U.S.C. §3142(c)(1)(B) were violative of his due process rights[1].

Thereafter, and in response to Frederick's motion, the Court held a second review hearing. Frederick called seven witnesses at the hearing and made a substantial evidentiary showing in support of his motion. The Government, and the guardian ad litem for the two alleged child victims, both resisted the motion. The Court ultimately granted the motion in part and denied it in part. It granted the motion insofar as the same sought to permit Frederick to reside with Roger McMath, a new third party custodian, at the latter's residence just south of Mission, South Dakota (approximately 20 to 25 miles from the Frederick family homestead). The Court, however, denied the motion to the extent it requested a declaration that the electronic monitoring and curfew conditions required by §3142(c)(1)(B), were unconstitutional, either facially or as applied in this case. The Court entered an amended release order memorializing the change in release conditions and stated that it would provide a more detailed analysis of Frederick's constitutional claims in a separate written opinion.[2]

## II.

Frederick is charged with aggravated sexual abuse of a female child, W.F., when she was under the age of 12 years, abusive sexual contact and sexual abuse with J.F., another female child, when she was between 12 and 16 years old, and tampering with J.F., by

---

[1]As far as the Court can tell, this is the first constitutional challenge to the Adam Walsh Act, under the Due Process Clause, made by a defendant charged with sexually abusing a child.

[2]Prior to the second review hearing, the Government filed a reply to the motion to modify release conditions, objecting to the same, which Frederick promptly responded to. Following the hearing, he filed an amended response supplementing his due process claims.

3

instructing her not to tell the truth about contacts she and he had and him allegedly sexually abusing her[3].

W.F. and J.F. are Frederick's nieces. They are among several children that Kathleen adopted. Kathleen's home is near Carter, South Dakota, and in close proximity to Frederick's residence as well as other homes belonging to members of the Frederick family.

W.F. is currently residing off of the Rosebud Reservation in Plankinton, South Dakota. J.F. has been returned to the custody of the South Dakota Department of Social Services ("DSS"). She is reportedly not welcome in Kathleen's home.

In December 2007, W.F. disclosed to DSS that "her mother's brother [Frederick] touched her inappropriately. [W.F.] stated that [Frederick] put his fingers inside her vagina . . . when she and [he] went riding on the four-wheeler." DSS was also advised of the following:

1.  Kathy stated that [W.F.] is a liar and that [Frederick] would not do anything like that. Kathy stated that [W.F.] lies all the time and [W.F.] doesn't know what she is talking about.

2.  Kathy stated DSS wouldn't do anything about the report as she (Kathy) knows people in DSS and they won't believe [W.F.] either.

On May 12, 2008, W.F. was interviewed by Federal Bureau of Investigation ("FBI") Agent Mark Fendrich. During that interview, W.F. related that when she was about 8 years old, Frederick would give she and all her siblings a ride in his All-Terrain Vehicle ("ATV"). She said that she was the last child to ride the ATV and that one time, while wearing shorts

---

[3]Only the aggravated sexual abuse charge triggers the mandatory release conditions of the Adam Walsh Act and provides Frederick with standing to make his constitutional challenge.

and sitting in the front seat of the vehicle with Frederick, he placed his hand inside her panties and touched her vaginal opening with his fingers.

Follow-up interviews of W.F. were later conducted in March, 2010. At that time, W.F. provided more details to FBI Agent Oscar Ramirez, telling him that the rubbing lasted for a while during the ATV ride and that Frederick asked her to "touch his lizard", or "at least hang onto it." She also disclosed that she was not threatened by Frederick, but was admonished by him not to tell anyone about the touching.

On January 26, 2010, Ramirez interviewed J.F., who also disclosed that Frederick had touched her. She said that Frederick last touched her when she and he were in Pierre, South Dakota. She divulged that while looking at a museum exhibit with several American Indian artifacts, Frederick approached her from behind and then "went below" and rubbed her butt over her clothing.

J.F. reported that this type of touching had occurred more than once and began in 2008 when she started at the Kline School. She said the touching occurred when she was by herself with Frederick inside his or her homes and outside by her family's barn. She believed the touching occurred approximately 13 times and was always over her clothing. She disclosed that one time, while driving in his car, Frederick asked to see her breasts, and when she refused to agree to this, he pulled her shirt off and looked at them. She likewise revealed that in the past, Frederick asked if he could touch her elsewhere on her body, but she would not allow him to do so.

5

On January 29, 2010, Ramirez asked J.F. if she would be willing to make a controlled telephone call to Frederick. J.F. agreed to do so and at 11:59 a.m. that same day, Ramirez recorded a call that J.F. placed to Frederick. During the call, Frederick is heard to say:

1. Don't tell the cops nothing.

2. Tell the cops that he and she had never done anything and that he had never done anything to her; and that he may have tickled her or held her, but never touched her any place that is not right.

3. Not to say anything about stopping on a hill, that he only asked her, and that was a mistake, that he would go to jail for the rest of his life if she said anything about the incident; not to tell the truth about it unless she wanted him to go to jail for the rest of his life and please not to say anything about what happened.

4. His kids would never see him again and his grandkids would never see him again.

J.F. sobbed during the recording. After she regained her composure, Ramirez asked her what happened "on the hill." J.F. described how Frederick stopped his vehicle, told her to move closer to him, touched her buttocks, hugged her and asked if he could make love with her. She told him no but he pulled off her shirt and looked at her breasts anyway.

About an hour after the telephone call was made, Ramirez made contact with Frederick. In their dialogue, Frederick denied that he engaged in any inappropriate contact with J.F.. He also said that the last conversation he had with her was about 8:30 that morning and that he and she only talked about her book order and her orthodontic retainer. He also indicated that he never told either W.F. or J.F. to lie or not talk to law enforcement authorities about details involving the two of them.

Frederick is 59 years old, an enrolled member of the Rosebud Sioux Indian Tribe, a life-long resident of the Rosebud Sioux Reservation and has consistently maintained employment on or near the Reservation for the entirety of his adult life. He is a 20-year veteran of Rosebud trial law enforcement agencies, having been a police officer and a wildlife enforcement officer for the Tribe, and has served on the Rosebud Sioux Tribal Council (the governing body of the Tribe). All of his personal and real property assets are located on the Rosebud Reservation.

Frederick is presently employed by Sinte Gleska University, located in Mission, and has taken vacation time and personal leave in order to continue his employment with the University. At the time of the April 29, 2010 review hearing, he was almost out of vacation and personal leave time. His work is located either at a rural buffalo ranch or in his office at the University.

In addition to his job with the University, Frederick also runs a large farm/ranch operation. He contends, in his motion, that he is needed on the farm/ranch to help with the calving of cows, a vital aspect of his operation and the survival of the same.

Frederick has no history of mental illness. He does, however, have a medical history of lower back and shoulder injuries and other conditions, including high blood pressure, acid reflux disorder, prostate problems and asthma, all of which are under doctor's care and/or controlled by medications. At the time of his arrest, he was not on probation, parole or other release for any federal, state or tribal offense and had no prior criminal convictions.

Frederick maintains that the case against him is weak and defies common sense. He asserts that over the past nearly six decades, he has had dozens of children, many of whom

7

have been females, in and out of his home and has never been alleged to have engaged in sexual misconduct by anyone else. He contends that the alleged victims' allegations are the product of collusion, as evidenced by the fact that a third sister, the same age as the two alleged victims, has made no allegations against him. He characterizes the allegations as "he said/she said" ones and discounts the magnitude of his taped conversation with J.F. He argues that he should not be subject to electronic monitoring and a curfew and that he should be allowed to return to the family homestead and have contact with Kathleen, her children (his nieces and nephews) and other family members. He also claims that the electronic monitoring and curfew requirements of his prior release are overly restrictive conditions and should be lifted to allow for his continued employment and ability to maintain his farm/ranch.

III.

18 U.S.C. §3142(a) and (b) allow a judicial officer to release a defendant on personal recognizance before trial subject to the conditions that the defendant not commit a crime during the period of release and cooperate in the collection of a DNA sample. Section 3142(c) addresses the situation in which the judicial officer determines that a personal recognizance release will not assure the defendant's appearance and/or will endanger the safety of another person or the community. In this situation, the judicial officer must release the defendant subject to the "least restrictive further conditions, or combination of conditions." §3142(c)(1)(B).

Section 3142 permits the judicial officer to find that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person in the community," in which case the officer "shall order the detention

8

of the [defendant] before trial." §3142(e)(1). Such an order may be entered, however, only after a hearing at which the defendant is "afforded an opportunity to testify, present witnesses, cross-examine witnesses who appear at the hearing and to present information by proffer or otherwise." §3142(f). The facts necessary to support a finding under §3142(e)(1) must be established "by clear and convincing evidence." §3142(f).

Subsection (e)(3) of §3142 requires the judicial officer to treat some defendants, charged with certain enumerated offenses, differently. This subsection creates a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community if . . . there is probable cause to believe that the defendant committed" any of the crimes listed in paragraphs (A) through (E) of the subsection. Among the crimes mentioned is aggravated sexual abuse (18 U.S.C. §2241). §3142(e)(3)(E) ("an offense involving a minor victim under section . . . 2241 . . . of this title.").

Section 3142(e) effectively replaces, depending upon the crime(s) charged, the judicial officer's discretion with a presumption that a defendant must rebut. If the judicial officer determines that the defendant has overcome the presumption, the officer may release the defendant subject to the conditions that the defendant not commit a crime while on release and provide a DNA sample, if the same is necessary, and subject to the "least restrictive further condition[s]" that will reasonably assure the appearance of the defendant and protect other persons and the community. §31421(c)(1)(A) and (B).

The Adam Walsh Child Protection Safety Act of 2006 ("Adam Walsh Act"), Pub.L. 109-248, 120 Stat. 587 (July 27, 2006), amended §3142(c)(1)(B) and in doing so changed

how defendants accused of aggravated sexual abuse, and other crimes referred to in §3142(e)(3)(E), are treated. Now, if a defendant rebuts the presumption found in subsection (e)(3)(E), the judicial officer must impose, in fashioning "the least restrictive further conditions", electronic monitoring and five enumerated conditions, one of which is a specified curfew. §3142(c)(1)(B). Congress' directive is clear, unequivocal and mandatory. Id. ("any release order shall contain, at a minimum, a condition of electronic monitoring and each of the conditions specified at subparagraphs (iv), (v), (vi), (vii), and (viii)").

Frederick is, and has been for some time, out on pre-trial release. As part of his release, he is subject to electronic monitoring, a curfew and the other required conditions set forth in §3142(c)(1)(B)(iv)-(viii). In his motion and written responses to the Government's objections, he urges the Court to follow the lead taken by other courts and declare this electronic monitoring and curfew release conditions unconstitutional, whether facially or as applied to him, under the Fifth Amendment's Due Process Clause.

IV.

A.

Facial challenges to congressional enactments have been out of favor with the Supreme Court for some time. Several reasons have been cited by the Court for its "dim view" of such challenges:

> Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually bare bones records." Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Finally, facial challenges threaten to short circuit

the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "a ruling of unconstitutionality frustrates the intent of the elected representatives of the people."

Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450-51 (2008) (citations omitted).

A facial challenge is the most difficult challenge to mount successfully. United States v. Salerno, 481 U.S. 739, 745 (1987). A bail statute is facially unconstitutional only where no set of circumstances exist under which the statute would be valid. Id. With respect to federal defendants, [t]he fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." Id. Furthermore, [t]o sustain [the Bail Reform Act's provisions, a court] need only find them 'adequate to authorize the pre-trial detention of at least some persons charged with crimes' whether or not they might be insufficient in some particular circumstances." Id. at 751 (quoting Schall v. Martin, 467 U.S. 253, 264 (1984)).

While some members of the Supreme Court have recently criticized the Salerno standard as being too strict, see Grange, 552 U.S. at 449; Washington v. Glucksberg, 521 U.S. 702, 739-40 & n. 7 (1997) (Stevens, J., concurring in judgments), this standard remains the basis for evaluating facial constitutional challenges in the Eighth Circuit, see United States v. Stephens, 594 F.3d 1033, 1037-38 (8th Cir. 2010).[4] Regardless, "[i]n determining

---

[4]There appears to be an ongoing disagreement among Justices of the Supreme Court regarding the viability of the Salerno standard in connection with challenges to the facial validity of a legislative act. Grange, 552 U.S. at 449 (acknowledging that "some Members of the Court have criticized the Salerno formulation"); Glucksberg, 521 U.S. at 739-40 and n.7 (Stevens, J., concurring) (noting that "[t]he appropriate standard to be applied in cases making facial

(continued...)

whether a law is facially invalid, [a court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." Grange, 552 U.S. at 449-50 (quoting United States v. Rains, 362 U.S. 17, 22 (1960)).

In contrast, an as-applied challenge, requires an analysis of the particular facts of a case to determine whether the application of a statute, even one constitutional on its face, deprived a defendant, to whom it was applied, of a protected right. United States v. Polouizzi, No. 06-CR-22 (JBW) 2010 WL 1048192 at *4 (E.D.N.Y. Mar. 23, 2010); see also Stephens, 594 F.3d at 1039-40. The factual context involved and the circumstances of the defendant are critical when evaluating such a challenge. Polouizzi, 2010 WL 1048192 at *4.

The distinction between a constitutional attack directed to the validity of a statute on its face, as opposed to as applied, is an important distinction that has implications for the future enforceability of the statute. Indeed, if a court holds a statute unconstitutional on its face, the government generally may not enforce the statute under any circumstances. Contrariwise, when a court determines that a statute is unconstitutional as applied to a particular situation, the government may enforce the statute in different circumstances. See

---

[4](...continued)
challenges to state statutes has been the subject of debate within this Court" and arguing that the Court had never applied the strict Salerno standard, even in Salerno itself. The uncertainty surrounding the authority of the Salerno holding is significant. City of Chicago v. Morales, 527 U.S. 41, 55, n.22 (1999) (plurality opinion) (Stevens, J., Souter, J., and Ginsburg, J.) ("To the extent we have consistently articulated the clear standard for facial challenges, it is not the Salerno formulation, which has never been the decisive factor in any decision of this Court . . . ."). Despite this uncertainty, the Eighth Circuit has clearly stated that the "no set of circumstances" standard applies to facial challenges outside of the First Amendment context, including those made to the Adam Walsh Act. Stephens, 594 F.3d at 1037-38.

Michael C. Dorf, <u>Facial Challenges to State and Federal Statutes</u>, 46 Stan. L. Rev. 235, 236 (1994).

Sequentially, courts should put off facial attacks and analyze as-applied ones first to avoid having to strike down, unnecessarily, an act of Congress. <u>See</u> <u>Grange</u>, 552 U.S. at 450 (noting that facial invalidation of the legislative act contravenes the "fundamental principle . . . that courts . . . should [not] formulate a rule of constitutional law broader than is required by the precise fact to which it is applied"). Courts, however, do not always proceed in this manner when they are called upon to decide the propriety of constitutional challenges, including those made to provisions of the Adam Walsh Act. <u>See</u> e.g. <u>United States v. Arzberger</u>, 592 F. Supp.2d 590, 599-604 (S.D.N.Y. 2008); <u>United States v. Torres</u>, 566 F. Supp.2d 591, 596-99 (W.D. Tex. 2008).

A number of courts have declared the Adam Walsh Act amendments to be unconstitutional, on their face, and/or as applied. <u>See</u> e.g. <u>Polouizzi</u>, 2010 WL 1048192 at *12; <u>United States v. Smedley</u>, 611 F. Supp.2d 971, 977 (E.D. Mo.. 2009); <u>United States v. Merritt</u>, 612 F. Supp.2d 1074, 1080 (D.Neb. 2009); <u>United States v. Rueb</u>, 612 F. Supp.2d 1068, 1074 (D.Neb. 2009); <u>Arzberger</u>, 592 F. Supp.2d at 607; <u>Torres</u>, 566 F. Supp.2d at 602; <u>United States v. Vujnovich</u>, No. 07-20126-01-CM-DJW, 2008 WL 687203 at *3 (D.Kan. Mar. 11, 2008); <u>United States v. Crowell</u>, Nos. 06-M-1095, 06-CR-291E(F), 06-CR-304S(F), 2006 WL 3541736 at *11 (W.D.N.Y. Dec. 7, 2006). Several courts, however, have ruled otherwise or avoided the constitutional question through statutory construction. <u>See</u> e.g. <u>Stephens</u>, 594 F.3d at 1038-39; <u>United States v. Kennedy</u>, 327 Fed. Appx. 706, 707-08 (9th Cir. 2009); <u>United States v. Cossey</u>, No. CR 09-09-M-D-M, 637 F. Supp.2d 881, 891

(D.Mont. 2009); <u>United States v. Crites</u>, No. 8:09CR 262, 2009 WL 2982782 at **2 (D. Neb. Sept. 11, 2009); <u>United States v. Gardner</u>, 523 F. Supp.2d 1025, 1028-36 (N.D. Cal. 2007).

B.

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law." U.S. Const. amend. V. This guarantee protects individuals against two types of government action. <u>Salerno</u>, 481 U.S. at 747. Substantive due process prevents the government from engaging in conduct that "shocks the conscience" or that interferes with "rights implicit in the concepts of ordered liberty." <u>Id</u>. Procedural due process insures that any government action that deprives a person of life, liberty or property is implemented in a fair manner, <u>id</u>., by providing an "opportunity to be heard at a meaningful time and in a meaningful manner." <u>Mathews v. Eldridge</u>, 424 U.S. 319, 334 (1976).

Procedural due process is not a technical concept or a fixed rule that is unrelated to time, place and circumstances. <u>Id</u>. Rather, it is flexible and calls for such procedural protections as are demanded in each particular situation. <u>Id</u>. Three distinct factors must be weighed and balanced when determining what process is due in a given situation: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the burdens that any additional or substitute procedural requirements would entail. <u>Id</u>. at 334-35.

Some courts, including ones in the Eighth Circuit, have held that the Adam Walsh Act amendments to the Bail Reform Act, including those pertaining to electronic monitoring and curfew, violate a pre-trial defendant's procedural due process rights under the Fifth Amendment. See e.g. Polouizzi, 2010 WL 1048192 at *3 (collecting cases). Other courts, including the Eighth Circuit Court of Appeals itself, have upheld the validity of the amendments in the face of procedural due process challenges. Id.

V.

Frederick's facial due process challenge can be easily disposed of. Such a challenge fails because he cannot establish that there are no aggravated sexual abuse defendants for whom electronic monitoring or a curfew is appropriate. See Salerno, 481 U.S. at 751. There are certainly defendants for whom electronic monitoring and curfew would be necessary to assure their presence at trial or to ensure the safety of other persons or the community. Stephens, 594 F.3d at 1038; see also Cossey, 637 F. Supp.2d at 891 (dismissing the defendant's facial challenge because "there are circumstances under which the [Adam Walsh Act] amendments may be applied constitutionally. This requires interpreting the [Act's] amendments as allowing a judicial officer broad discretion to fashion conditions of pre-trial release on an individualized basis within the framework the [Act's] amendments provide."); Gardner, 523 F. Supp.2d at 1030, n.3 (rejecting a similar facial challenge because "[t]here are circumstances where [the Adam Walsh] Act can be applied constitutionally – e.g., where a court determines all the minimum conditions mandated by the [ ] Act are in fact warranted") And, here in this District, the Court has found it appropriate to impose electronic monitoring and a curfew where defendants have been charged with aggravated

15

sexual abuse in order to minimize the risk of flight and/or danger they may present. See Stephens, 594 F.3d at 1038; Crites, 2009 WL 2982782 at *2. These situations demonstrate that circumstances exist when the mandates of the Adam Walsh Act amendments are constitutionally valid, sufficient to defeat Frederick's facial challenge.

Aside from this, to the extent that Frederick claims that the Adam Walsh Act offends the Fifth Amendment by stripping judges of their discretion and impermissibly imposing a "one-size-fits-all straight jacket" of conditions that restrict the liberty of accused child sex abusers, his claim is foreclosed by both Salerno and Stephens. In Salerno, the court rejected a substantive due process challenge to the procedures of the Bail Reform Act in large part because the Act's procedures included both a hearing and an individualized determination as to whether the pre-trial defendant was a flight risk or a danger to others or to the community. 481 U.S. at 741, 751-52. Significantly, nowhere in Salerno did the Supreme Court hold that, as a matter of procedural due process, statutorily mandated conditions of release are always facially unconstitutional. Stephens, 594 F.3d at 1039.

The Adam Walsh Act amendments do not deprive defendants charged with aggravated sexual abuse "of a detention hearing or an individualized determination [as to] whether detention or release is appropriate." Id. As relevant to Frederick's case, the only effect of the amendments is to require some kind of electronic monitoring and a curfew. Id. Frederick remains entitled to, and has received, a detention hearing (in fact more than one), wherein a personal assessment has been made as to whether, and to what extent, these conditions should be imposed on him. Id.

16

In view of <u>Salerno</u> and <u>Stephens,</u> Frederick cannot succeed on his facial due process challenge to the Adam Walsh Act amendments. Accordingly, his motion, insofar as it seeks to have the mandatory release conditions imposed by the Act declared facially unconstitutional, is denied.

## VI.

It is an established principle of statutory construction that a statute should be read, if such a reading is fairly possible, to avoid raising doubts as to its constitutionality. <u>St. Martin Evangelical Lutheran Church v. South Dakota</u>, 451 U.S. 772, 780 (1981); <u>Stephens</u>, 594 F.3d at 1036, n.2. Construing the Adam Walsh Act to require a court to exercise its discretion, when applying the mandatory release conditions, including those relating to electronic monitoring and curfew, avoids the need to pass on the constitutionality of the Act and its amendments as applied here. Such an approach was recently taken by the Ninth Circuit, <u>see</u> <u>Kennedy</u>, 327 Fed. Appx. at 707, and has been tacitly endorsed by the Eighth Circuit, <u>see</u> <u>Stephens</u>, 594 F.3d at 1040, n.4. Adopting this approach, and construing the Act as the Ninth Circuit did (a construction which the Eighth Circuit in <u>Stephens</u> has seemingly put its blessing on, <u>see id</u>.), the Court easily finds and concludes that the Act and its amendments pass constitutional muster under the Due Process Clause.

Furthermore, such an interpretation provides harmony between the provisions of the Adam Walsh Act and §3142(j). The latter subsection states clearly that "Nothing in this section shall be construed as modifying or limiting the presumption of innocence." Congress, through subsection (j), expressly incorporated a principle ("the presumption of innocence") into the Bail Reform Act as a rule of construction. <u>See Cossey</u>, 637 F. Supp.2d

at 888. The Adam Walsh Act amendments are only at odds with the purpose of the Bail Reform Act if they are construed to require the mandatory imposition of the same conditions in every case (based on the notion that defendants accused of certain sex offenses are likely to be sexual deviates who will prey on children and commit other crimes). Such a construction would directly conflict with how Congress has directed the Bail Reform Act is to be interpreted and/or would render subsection (j) thereof nugatory. Id. at 889. Inasmuch as a statute should not be interpreted so as to make one part of the same inoperative, see Colautti v. Franklin, 439 U.S. 379, 392 (1979), overruled in part on other grounds, the Court must decline to accept Frederick's reading of what §3142(c)(1)(B) commands. See Stack v. Boyle, 342 U.S. 1, 4 (1951) (the right to bail prior to trial is inextricably intertwined with the presumption of innocence and, unless the right is preserved, the presumption will lose its meaning). Treating every defendant accused of sexual abuse as a member of a class which shares identical propensities and presents the same risk to the community cannot be what the Adam Walsh Act amendments require without eviscerating subsection (j) (because such an application of the amendments modifies and limits the presumption of innocence). Cossey, 637 F. Supp.2d at 889; see also United States v. Scott, 450 F.3d 863, 874 (9th Cir. 2006) ("The assumption that [the defendant] was more likely to commit crimes than other members of the public, without an individualized determination to that effect, is contradicted by the presumption of innocence."). Construing the Adam Walsh Act to permit an individualized assessment in the determination of appropriate pre-trial release conditions allows the Act's amendments to be congruent with the remaining provisions of the Bail Reform Act and with the presumption of innocence, an axiomatic and elementary rule of law, see Coffin v. United

States, 156 U.S. 432, 453 (1895). And, more importantly, it avoids the necessity of having to decide the as-applied constitutional challenge raised in Frederick's motion. Rosenberg v. Fleuti, 374 U.S. 449, 451 (1963); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring); see also United States v. Kahn, 524 F. Supp.2d 1278, 1284 (W.D. Wash. 2007) (applying constitutional avoidance doctrine to the defendant's contention that the Adam Walsh Act's mandatory pretrial release conditions are unconstitutional, as applied to him, under the Due Process Clause).

## VII.

Nonetheless, even assuming that there is some palpable need or overarching reason to reach the merits of the constitutional question, Frederick cannot succeed on his as-applied challenge given the record now before the Court. He was not deprived of any right under the Due Process Clause to contest his release conditions and in particular, those requiring that he be subject to electronic monitoring and a curfew.

## A.

Frederick's liberty pending trial is the private interest affected here and that interest is both significant and protected. Polouizzi, 2010 WL 1048192 at *7; see also Salerno, 481 U.S. at 750 ("We do not minimize the importance and fundamental nature of an individual's right to liberty."); United States v. Wheeler, 254 U.S. 281, 293 (1920) (observing that under the Articles of Confederation, state citizens "possess the fundamental right, inherent in the citizens of all free governments . . . to move at will from place to place [within the limits of their respective states], and to have free ingress thereto and egress therefrom"). Electronic monitoring and curfew, without a doubt, impact his freedom-of-movement liberty. Polouizzi,

2010 WL 1048192 at *7; see also Stephens, 594 F.3d at 1041 ("Unquestionably, curfew and electronic monitoring affect a liberty interest of the accused . . . .") (Smith, J., concurring).

B.

But, the risk of erroneous deprivation of Frederick's liberty interest is minimal. Stephens, 594 F.3d at 1041 (Smith, J., concurring). He was given not one, but two hearings, to put on evidence, argue and contest the imposition of electronic monitoring, curfew and other conditions. At these hearings, the Court considered the factors set forth in §3142(g) and other factors specific to the case and made an particularized determination that such conditions were necessary to deny him access to the alleged victims, other children (especially those in his sister's home) and witnesses. Frederick was afforded the right to be heard, to call witnesses and to cross-examine them and to submit legal arguments in support of his position before any bail decisions were made. Moreover, the electronic monitoring and curfew conditions, as well as all other conditions of release, were not imposed on him mechanistically, pursuant to Congress' mandate in the Adam Walsh Act, but rather, were done so only after due consideration was made of the dictates of the Bail Reform Act, including the presumption of innocence found in §3142(j) of the same, the totality of the evidence adduced, the information proffered and the circumstances present. This individualized, fact specific and discretionary inquiry is what distinguishes the instant case from others involving due process challenges. See e.g. Kennedy, 327 Fed. Appx. at 707-08; Polouizzi, 2010 WL 1048192 at **7-11; Merritt, 612 F. Supp.2d at 1077-80; Rueb, 612 F. Supp.2d at 1071-74; Vujnovich, 2008 WL 687203 at **2-3. Such a distinction is important,

20

if not critical, to the constitutional analysis and the propriety of the Adam Wash Act amendments. See Kennedy, 327 Fed. Appx. at 707; Crites, 2009 WL 2982782 at *2; see also Stephens, 594 F.3d at 1040, n.4 (quoting with approval from the Ninth Circuit's decision in Kennedy, construing the Adam Walsh Act to require a reviewing court to exercise its discretion when applying the mandatory release conditions).

## C.

The Government's interest in "protect[ing] children from sexual attacks and other violent crimes," Pub. L. No. 109-248, tit. II, 120 Stat. 587, 588, is both legitimate and compelling. See e.g. Osborne v. Ohio, 495 U.S. 103, 109 (1990) ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling."); Salerno, 481 U.S. at 749 (finding a strong interest in preventing harm by arrestees); Stephens, 594 F.3d at 1041 (Smith, J., concurring) ("[t]he government has a significant interest in ensuring the safety of the community in general and specifically in protecting children from being victimized by those who commit child [sex] related offenses"); see also United States v. Comstock, No. 08-1224, 2010 WL 1946729 at *24 (U.S. May 17, 2010) (Thomas, J., dissenting) ("To be sure, protecting society from violent sexual offenders is certainly an important end. Sexual abuse is a despicable act with untold consequences for the victim personally and society generally."). Despite the lack of congressional debate and findings regarding the electronic monitoring and curfew provisions of the Adam Walsh Act, see Gardner, 523 F. Supp.2d at 1030 ("[t]he Adam Walsh Act contains no such express legislative findings or evidence"); Torres, 566 F. Supp.2d at 600 ("Congress did not engage in substantive debate nor develop supporting congressional

reports with regard to the Adam Walsh Amendments at issue here."), Congress' avowed purpose – to protect children – must be accorded great weight. Stephens, 594 F.3d at 1041 (Smith, J., concurring).

The Court recognized that providing Frederick with an individualized determination of the need for electronic monitoring and a curfew would not detract from or unduly burden Congress' stated purpose. By subjecting his case to judicial review and an individualized assessment under the Bail Reform Act, Frederick's interest, and that of the Government, were both considered before the imposition of any release conditions.

In Salerno, the Supreme Court upheld the constitutionality of the Bail Reform Act against a due process challenge. The Court found that the Act withstood constitutional scrutiny because it struck an appropriate balance between the government's regulatory interest in community safety and an individual's liberty interest and because it provided extensive procedural safeguards specifically designed to further the accuracy of the likelihood-of-future dangerousness determination. 481 U.S. at 750-52. The same interests and protections were considered in Frederick's case, notwithstanding the mandatory provisions of the Adam Walsh Act. He thus has no room to complain about the process to which he was entitled to, and actually received, with respect to his release conditions. See Crites, 2009 WL 2982782 at *2, see also and compare Vujnovich, 2008 WL 687203 at *3 (holding that "[b]ecause the [m]agistrate [j]udge did not determine whether it was necessary to impose the pre-trial release conditions in order to secure [the] defendant's appearance or the safety of other persons or the community, the application of the Adam Walsh [Act's] [a]mendments in this case eliminated an independent judicial determination as to the

necessity of the release conditions [and thus] violated [the] defendant's right to procedural due process.")[5]

D.

Lastly, and unlike in other cases, the Court, given the record before it, would have imposed electronic monitoring and curfew absent the Adam Walsh Act. Compare Smedley, 611 F. Supp.2d at 974. These conditions were designed to maintain some level of control over Frederick's actions. Specifically, they were intended to:

1.  Provide limitations and structure to his life while enabling him to continue his employment and handle, from a distance, his farm/ranch operations;

2.  Prevent him from having access, and being in close proximity, to the alleged victims, children and witnesses in the case;

3.  Increase his accountability by providing information on his whereabouts at all times;

4.  Help recognize violations early and make it less likely that he will engage in unlawful and aberrant conduct; and

5.  Enhance the enforcement ability of other/existing conditions.

Both conditions were imposed after the Court delicately weighed and balanced the various interests involved and in an effort to carry out the purposes of the Bail Reform and Adam

---

[5]Having dismissed Frederick's as-applied due process challenge on its merits under the Mathews standard, the Court need not decide whether the less stringent one of Medina v. California, 505 U.S. 437, 445 (1992), to wit, a rule of criminal procedure does not violate procedural due process unless it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental", should apply. Courts that have addressed the constitutionality of the Adam Walsh Act amendments under the Due Process Clause, have not utilized the Medina test. Polouizzi, 2010 WL 1048192 at *5; see also Stephens, 594 F.3d at 1040-41 (Smith, J., concurring) (applying the analysis in Mathews in determining whether the restrictions imposed by the Adam Walsh Act deprived the defendant of any right protected by the Due Process Clause).

Walsh Acts, while keeping always in mind the foundational standard that a defendant is presumed innocent until proven guilty.

## VIII.

The amendments to the Adam Walsh Act are neither unconstitutional on their face, nor as applied in this case, under the Due Process Clause. The Eighth Circuit's decision in Stephens, which has binding force in this case, repels Frederick's facial challenge. With respect to his as-applied challenge, the Court need not reach the merits of the same, but if called upon to do so, finds and concludes that the imposition of electronic monitoring and curfew restrictions, as part of his release, did not violate due process strictures.

For the reasons discussed herein, and based on the record now before the Court, it is hereby

ORDERED that Frederick's Motion to Modify Release Conditions, filed at Docket No. 24, shall be and the same is denied insofar as it seeks to invalidate, on due process grounds, the electronic monitoring and curfew conditions of the Adam Walsh Act both facially and as applied to him.

Dated this 27th day of May, 2010, at Pierre, South Dakota.

**BY THE COURT:**

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

**ATTEST:**
**JOSEPH HAAS, CLERK**
**BY:** _____
          **Deputy**
**(SEAL)**

24