UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION



FILED
SEP 03 2010

*****************************************************************************

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 10-30021-RAL |
| Plaintiff, | * | |
| | * | REPORT AND RECOMMENDATION |
| -vs- | * | CONCERNING DEFENDANT'S |
| | * | SUPPRESSION MOTION |
| THOMAS WILLIAM FREDERICK, | * | |
| Defendant. | * | |

*****************************************************************************

## Summary

J.F., a 14-year-old girl, reported that her uncle, Thomas William Frederick, had touched her in a sexual way more than a dozen times. Law enforcement then requested J.F., and she agreed, to make a recorded telephone call to Frederick. During the call, Frederick made incriminating statements. Frederick claims that J.F. did not have the capacity to consent, and did not give valid consent ahead of time, to the recording of her conversation with him. Because J.F.'s minority did not vitiate her ability to consent and because she properly consented to the recording, the Court recommends that Frederick's suppression motion be denied.

## Procedural Overview

Frederick filed a motion "in limine to suppress" certain tape recordings made by FBI Agent Oscar Ramirez. In his supporting brief, Frederick seeks to exclude the recordings on foundational grounds and because they were obtained illegally. Specifically, he argues that the recordings did not satisfy the admissibility requirements of *United States v. McMillan*.[1] He also asserts that the recordings were made without valid consent and violated the provisions of 18 U.S.C. §2510, *et. seq.*

Because it was only authorized to handle case-related suppression matters, the Court had to figure out what exactly Frederick's motion was – a suppression or in limine motion or both – and how the motion should be handled. The Court concluded that the motion was one to suppress *and* in limine. Consistent with the scheduling order then in place, the Court ruled that it should determine the suppression aspect of the motion – asserting lack of consent and illegal making of the recordings – on a report and recommendation basis and that the District Court should decide the in limine portion of the motion – pertaining to the *McMillan* prerequisites – at a later time closer to trial.

On July 8-9, 2010, the Court heard testimony from 4 witnesses and received 17 exhibits into evidence. At the end of the hearing, the Court agreed to hold the

---

[1] *United States v. McMillan*, 508 F.2d 102, 104 (8th Cir. 1974), *cert. denied*, 421 U.S. 916 (1975).

evidentiary record open so that the parties could submit additional information and make further arguments. The Court has now received that information and the supplemental arguments from counsel and is ready to pass on the suppression component of Frederick's motion.

## Factual Background

On January 26, 2010, Ramirez interviewed J.F. During the interview, J.F. disclosed that Frederick had over-the-clothing sexual contact – touching of her buttocks and breasts – on several earlier occasions.

A day or two after this interview, Ramirez contacted J.F. at school and asked if she would make a consensual recording and explained what this meant. She agreed to do so.

Ramirez and Ken Fisher, a criminal investigator for the Rosebud Sioux Tribe, then met with J.F. in the school library on January 29, 2010. There, Ramirez talked to her and asked again if she would make a recorded telephone call to Frederick. She said she would and signed a form permitting Ramirez and Fisher to tape record the call. A short time later, J.F. placed the call and spoke with Frederick for approximately six minutes. During the call, Ramirez assisted J.F., providing her with scripted statements and questions for her to use in the conversation. After J.F. brought up an incident that happened when the two of them were on their way to school and "stopped on that hill", Frederick began making inculpatory statements.

3

He had no idea he was being tape recorded. Nor did J.F.'s mother know anything about what J.F. was doing. Ramirez obtained approval from his superiors, but not from a judge – via a warrant or court order – before recording the conversation.

**Capacity to Consent**

At the outset, Frederick contends that J.F. was "incapable of giving consent" because of her tender years – she was only 14 years old – at the time she made the recorded call. He argues that Ramirez and Fisher were required to contact and obtain consent from her mother before tape recording any conversations with Frederick. It is the combination of J.F.'s status as a minor and the lack of parental consent that, in Frederick's eyes, invalidates any express or implied consent given and requires that the recorded conversation be suppressed. The Court disagrees.

First, 25 U.S.C. §3206 appears on its face to defeat Frederick's parental consent argument. The statute allows law enforcement officers to interview an Indian child without first obtaining parental consent if the child has been subject to abuse in Indian country. Here, Ramirez and Fisher reasonably suspected, based on J.F.'s own disclosures, that Frederick had sexually abused her on numerous occasions and therefore did not need to contact her mother before proceeding with the tape recording.

Second, just because J.F. was 14 years of age at the time, does not mean that she lacked the capacity to consent. Indeed, courts have held that juveniles at or

4

around J.F.'s age, were legally capable of consenting to the monitoring and recording of a telephone conversation with another.[2]

One case, *United States v. Rios*, involved a 14-year-old child who made a consensual tape recorded telephone call to her stepfather.[3] *Rios* is significant because the facts are remarkably similar to those in Frederick's case,[4] and because courts on direct, discretionary and collateral review all rejected the stepfather's claims attacking the propriety of his stepdaughter's consent.[5]

*Bell* is another case involving a 14-year-old child who cooperated with police and placed a controlled telephone call to her former foster parent.[6] The state appeals court held that the trial court did not err, or abuse its discretion, by admitting the police monitored, recorded and later transcribed call into evidence at trial.[7]

---

[2]*See e.g., Bryant v. Mostert*, 636 F.Supp.2d 1303, 1314-15 (M.D. Fla. 2009); *United States v. Rios*, 48 M.J. 261, 265 (C.A.A.F. 1998), *cert. denied*, 525 U.S. 1156 (1999); *State v. Bell*, No. CA2008-05-044, 2009 WL 1395857 at \*\*1, 7 (Ohio Ct. App. May 18, 2009); *State in re J.D.H.*, 171 N.J. 475, 482-83, 795 A.2d 851, 855-56 (2002); *State v. Smart*, 136 N.H. 639, 661-63, 622 A.2d 1197, 1212-13, *cert. denied*, 510 U.S. 917 (1993); *Legg v. State*, 207 Ga. App. 399, 400, 428 S.E.2d 87, 88 (1993).

[3]*Rios*, 48 M.J. at 262-64.

[4]*See Rios*, 48 M.J. at 263-264.

[5]*See Rios v. Lansing*, 116 Fed.Appx. 983, 984-87 (10th Cir. 2004).

[6]*Bell*, 2009 WL 1395857 at \*\*1, 7.

[7]2009 WL 1395857 at \*7.

5

The rule is the same in third party consent cases. Minors are capable of giving valid consent and courts have recognized this.[8]

Finally, the Supreme Court has expressly determined that juveniles can knowingly and intelligently waive their Fifth Amendment rights and voluntarily consent to interrogation.[9] And, the High Court has consistently said that the government does not violate the Fourth Amendment by recording and transmitting private conversations with the consent of one party but not the other.[10]

Although still a child at the time, J.F. had the legal capacity to consent to the recording. Frederick's claim to the contrary has no merit.

**Consent to the Recording**

Title I of the Electronic Communications Privacy Act of 1986 regulates the interception of wire, oral and electronic communications.[11] Section 2511(2)(c) makes it lawful to intercept these communications if the party to them is acting under color

---

[8] *See e.g., United States v. Sanchez*, 608 F.3d 685, 688-89 (10th Cir. 2010); *United States v. Broaden*, No. 96-10439, 1997 WL 345796 at *2 (9th Cir. June 23, 1997); *Lenz v. Winburn*, 51 F.3d 1540, 1548-49 (11th Cir. 1995); *United States v. Clutter*, 914 F.2d 775, 778 (6th Cir. 1990).

[9] *Fare v. Michael C.*, 442 U.S. 707, 726-28 (1979).

[10] *United States v. Caceres*, 440 U.S. 741, 749-55 (1979) ; *United States v. White*, 401 U.S. 745, 748-53 (1971).

[11] §2510, *et. seq.*

of law and "has given prior consent to [the] interception."[12] The Government bears the burden of proving consent.[13] In this case, the totality of the circumstances plainly indicate that J.F. was mindful of, and freely consented to, the recording of her conversation with Frederick.

Consent may be express or it may be implied from the circumstances.[14] A person who participates in a telephone conversation knowing that the call is being monitored impliedly consents to the monitoring.[15] This often occurs in the prison setting when an inmate places a call from an institutional phone knowing that the call may be recorded. In that situation, the inmate's knowledge of the monitoring policy plus his voluntary use of the telephone proves consent under §2511(2)(c).[16]

Here, J.F. executed a consent form giving Ramirez and Fisher permission – "voluntarily, and without threats of any kind" – to install a recording device on the telephone she used to record her conversation with Frederick. Before doing so,

---

[12]*See also White*, 401 U.S. at 750-53 (holding that such an interception does not violate the Fourth Amendment either)

[13]*United States v. Corona-Chavez*, 328 F.3d 974, 978 (8th Cir. 2003); *United States v. Tangeman*, 30 F.3d 950, 952 (8th Cir.), *cert. denied*, 513 U.S. 1009 (1994).

[14]*Corona-Chavez*, 328 F.3d at 978 (citing *Deal v. Spears*, 980 F.2d 1153, 1157 (8th Cir. 1992)).

[15]*Corona-Chavez*, 328 F.3d at 978.

[16]*United States v. Horr*, 963 F.2d 1124, 1125-26 (8th Cir.), *cert. denied*, 506 U.S. 848 (1992); *accord United States v. O'Connell*, 841 F.2d 1408, 1422, n.8 (8th Cir. 1988), *cert. denied*, 488 U.S. 1011 (1989); *United States v. Diaz*, 685 F.2d 252, 254-55 (8th Cir. 1982).

7

Ramirez read the form out loud to J.F. and explained what was expected of her. She not only knew, but also had advance notice of, what the agents planned to do and endorsed it.

J.F.'s consent to the telephone recording also can be inferred from her oral statements and willingness to cooperate. She verbally agreed to allow Ramirez to listen in on and record her conversation with Frederick. She also willingly participated in the preparations for the recording and provided agents with Frederick's telephone number. And, despite being fully informed that the conversation was being recorded, she at no time ever indicated that she wanted to discontinue the taping process.

The fact that J.F. knew what Ramirez and Fisher intended to do with the tape recording equipment and agreed to telephone Frederick, fully aware that her conversation with him would be monitored and recorded, is arguably sufficient, in and of itself, to establish consent.[17] But there are more arrows in the evidentiary quiver than this. There is J.F.'s written and verbal consent and Ramirez's credible testimony which, when coupled with J.F.'s own actions and conduct, are more than enough to satisfy the Government's burden.

---

[17] *Diaz*, 685 F.2d at 254-55; *United States v. Kirk*, 534 F.2d 1262, 1272-73 (8th Cir. 1976), *cert. denied*, 433 U.S. 907 (1977); *see also McMillan*, 508 F.2d at 104, n.2 ("[I]t would normally suffice for the government to show that the informer went ahead with the call after knowing what the law enforcement officers were doing[.]").

Certainly it would have been nice to hear from J.F. herself at the suppression hearing. But the Government's showing was by no means fatally flawed by its failure to call her as a witness.[18] Ramirez was peppered with questions about the circumstances leading up to and surrounding the recording of the conversation in question. And, if Frederick wanted J.F. to testify at the hearing, he could have subpoenaed her at any time.

Admittedly, there is evidence in the record that makes the consent issue a little murky. For example, J.F. was coached and given a script of suggested things to say. Although a good student academically, she was not a worldly or sophisticated 14-year-old and could be easily swayed. She was taken out of her classroom and asked to "set up" her own uncle. She was also asked to talk about events that no doubt preyed on her emotions and caused her to cry. And, she did not have the benefit of having her mother present to provide advice and guidance on what to do.

But all of these things, even when considered in combination, did not invalidate J.F.'s consent. They may have made the process uncomfortable for her, but she still knew what she was doing and assented to it. This is not a situation where Ramirez and Fisher deftly pulled the wool over J.F.'s eyes, or through subtle pressure and tact, got her to do something she didn't want to. Instead, she made an unconstrained choice – that is, one without duress, promises or coercion, express or

---

[18]*Diaz*, 685 F.2d at 255.

implied – to help Ramirez and Fisher make a recorded telephone call[19]. Yes, J.F. was "helped" at times on what to say, but toward the end of the call she was talking to Frederick without assistance. Regardless, some prompting was called for under the circumstances. Phoning Frederick and getting him to talk about something she'd rather forget was difficult for J.F. She cried and struggled, at times, to carry on a conversation with him. No doubt this was due in part to her just being plain scared – about messing up, having something go awry or not knowing what to say next.

Although she never said anything or followed Frederick's directive to "[t]ell 'em you want to be with your mom when they talk to ya", it may be that J.F. would have liked to have her mother present at the school to lend a helping hand. But her mother had already said that she did not believe Frederick had sexually abused J.F.'s sister, W.F., and probably wouldn't have believed J.F. either. Most likely, had J.F.'s mother been called and allowed to intervene, the planned telephone recording would have never gotten out of the starting gate.

While it is true that J.F. had to leave her classroom for a period of time, the interruption was brief. Her meeting with Ramirez and Fisher and call to Frederick did not take long (in fact, the entire recording, from beginning to end, lasted only 7

---

[19] *See Rios*, 48 M.J. at 263-65; *see also United States v. Antoon*, 933 F.2d 200, 203-06 (3d Cir.) (consenting participant's will was not overborne by authorities), *cert. denied*, 502 U.S. 970 (1991); *United States v. Kolodziej*, 706 F.2d 590, 593-95 (5th Cir. 1983) (codefendant voluntarily consented to making monitored telephone calls).

minutes and 35 seconds). And, the rendezvous, for the call, was in a next door room at J.F.'s school.

## Post Hearing Testimony

After the suppression hearing Frederick offered additional testimony from J.F.'s mother in the form of an affidavit. The affidavit had attached to it certain counseling notes, two reports and a psychological evaluation all prepared more than 10 years ago. The admissibility of the affidavit, under the Federal Rules of Evidence and based on the manner in which it was offered, is dubious at best. Even so, there is no need to delve into this evidentiary thicket because the Court did not find the mother, who testified at the hearing, to be a credible witness. Her testimony, which was offered to show that J.F. did not lawfully consent to the telephone recording of Frederick, was of limited probity and value.

## Conclusion

The Court finds that J.F. had the legal capacity to consent to the monitoring and recording of her conversations with Frederick and knowingly and voluntarily did so. This being the case, the suppression portion of Frederick's motion – which seeks to exclude from evidence at trial the January 29, 2010 tape recordings – should be denied.

## Recommendation

Accordingly, it is hereby

*RECOMMENDED* that Frederick's Motion in Limine to Suppress Tape Recordings, found at Docket No. 57, be denied in part for the reasons stated in this report.

**Notice**

An aggrieved party must file written objections, within 14 days, in order to attack this report and recommendation before the assigned United States District Judge.[20]

Dated this 3rd day of September, 2010, at Pierre, South Dakota.

**BY THE COURT:**

/s/ *Mark A. Moreno*
MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

**Postscript – New Experimental Format and Style**

After pondering Bryan Garner's proposal[21], the Court has decided, in this report and recommendation, to put all citations in footnotes and completely abstain from using substantive footnotes. Why? There are several good reasons:

---

[20]See 28 U.S.C. §636(b)(1).

[21] See Bryan A. Garner, *Garner on Language and Writing*, 448-66, 472-83, 592, 595 (2d ed. 2008) (advance copy); Bryan A. Garner, *Legal Writing in Plain English*, §28 at 77-83 (2001).

12

- To enhance readability.

- To make paragraphs more coherent and forceful.

- To get readers to focus on ideas, not numbers.

- To expose poor writing and thinking that is camouflaged by citations.

- To better discuss relevant case law contextually.

- To liberate the text of string citations.

- To end up with pages that look cleaner and that are more inviting and accessible.[22]

Most judges appear to prefer footnoted citations and many federal and state courts already use them.[23] But citational footnotes is a change from established custom in this District and may take some getting used to. The question though is whether subordinating citations in judicial writings should be adopted or archived. The Court solicits the thoughts of the bench and bar on this question and the whole idea of stripping out bibliographical references from the text of opinions.

The Court has also done away with all underlining to make the report and its text more legible. The Court agrees with Mr. Garner and Justice Antonin Scalia that with the advent of computers and available software, italicizing is now preferable to

---

[22]*See Garner on Language and Writing*, 448-55, 479-80.

[23]*See Garner on Language and Writing*, 474, 480-83, 595; *see also McGray Constr. Co. v. Office of Workers Compen. Programs*, 181 F.3d 1008 (9th Cir. 1999); *United States v. Parsee*, 178 F.3d 373 (5th Cir.), *cert. denied*, 528 U.S. 988 (1999); *Minneapolis Public Housing Auth. v. Lor*, 591 N.W.2d 700 (Minn. 1999).

underlining and should be the norm.[24] But should this aesthetic conversion be embraced or rejected? That remains to be seen and is an issue the Court welcomes input on.

---

[24]*See Garner on Language and Writing,* 100.